GERALD SINGLETON (SBN 208783)
BRODY A. McBRIDE (SBN 270852)
SINGLETON LAW FIRM, APC
115 West Plaza Street
Solana Beach, CA  92075
Tel:    (760) 697-1330
Fax:    (760) 697-1329
Email:  gerald@geraldsingleton.com
           brody@geraldsingleton.com

MARC APPLBAUM, (SBN 222511)
KETTNER LAW CORP
2150 West Washington Street, Suite 104
San Diego, CA 92110
Tel:    (619) 756-7300
Fax:    (619) 363-3944
Email:  marc@kettnerlawcorp.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CYNTHIA KENDRICK, individually, and as successor in interest to her now deceased husband, GARY KENDRICK, <br><br> Plaintiff, <br><br> v. <br><br> COUNTY OF SAN DIEGO, SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, San Diego Sheriff WILLIAM GORE, San Diego Sheriff's Deputy STEVEN BLOCK, and DOES 1 through 50, <br> Defendants. | Case No.  **'15CV2615 LAB JMA** <br><br> **COMPLAINT FOR DAMAGES AND VIOLATIONS OF CIVIL RIGHTS** <br><br> **JURY TRIAL DEMAND** |

//

COMPLAINT                                              1

## INTRODUCTION

1.      On the morning of March 27, 2015, Gerald Kendrick ("Gary") and his wife Cynthia Kendrick ("Cindy" and/or "Plaintiff") were at their home in Encinitas, CA. For years, Gary had been battling depression and, on that particular morning, Gary expressed his desire to end his suffering and take his own life. Gary grabbed his shotgun and held it under his chin.

2.      Cindy promptly dialed 911, but Gary warned her that if she called 911 he would pull the trigger. Cindy hung up the phone, unaware the call had actually gone through. Moments later, officers were in Gary and Cindy's front yard. Gary walked outside, holding the gun by the barrel and out to his side. At no point did Gary made any threats towards anyone, including the Sheriff's deputies, nor did Gary ever point the gun towards anyone.

3.      Sheriff's Deputy Steven Block ran onto the scene with an AR-15 and, within moments, fired two bullets at Gary. One bullet struck Gary, causing him to drop the gun and fall towards the ground, while the second bullet entered into the bedroom of a home several yards away. Seconds later, Block fired two more bullets, again striking Gary and ultimately killing him.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, as Plaintiff asserts causes of action arising under 42 U.S.C. § 1983, in addition to California causes of action that arise from the same controversy giving rise to Plaintiff's 1983 claims.

5.      The Court has personal jurisdiction over all Defendants in this action, as all Defendants are domiciled in the State of California.

6.      Pursuant to 28 U.S.C. § 1391, venue is proper in this Division of this District, as the events giving rise to this action occurred in the City of Encinitas, California, in the County of San Diego, which is located in the Southern District of California.

## PARTIES

7.      Plaintiff Cynthia Kendrick is a United States citizen and a California resident, who is, and at all times relevant to this Complaint was, domiciled in the County of San Diego.

8.      Defendant County of San Diego ("County") is a municipal entity duly organized under California law.

9.      The San Diego County Sheriff's Department ("Department") is a department of the County and is the chief law-enforcement entity for the County.

10.      Defendant William Gore ("Gore"), an individual domiciled in California, is, and at all times relevant hereto, was the Sheriff of San Diego County and, as such, is a final policymaker for the Sheriff's Department. He is responsible for training and supervising sheriff's deputies under his command. He is sued in his official capacity.

11.      Defendant Steven Block ("Deputy Block"), an individual domiciled in California, was, at all times relevant hereto, employed by the Sheriff's Department as a deputy sheriff. He is sued in his individual capacity.

12.      Plaintiff is informed and believes, and thereon alleges that, at all times relevant hereto, Defendants were each the agents and/or employees of each other, and in doing the things alleged, were acting within the scope of their agency and/or employment and with the permission of each other.  Plaintiff is informed and believes that Defendants were each responsible in some way for the harms alleged herein.

13.      At all times relevant hereto, Defendants were acting under color of state law, including, for example, by acting in according with the statutes, ordinances, regulations, policies, customs, and practices of the State of California, the County, and/or the Department.

14.      The true names and capacities, whether corporate, associate, individual or otherwise, of Defendant DOES 1 through 50, inclusive, are unknown to Plaintiff at this time.  Plaintiff will seek leave to amend this Complaint to allege their true names and capacities when the same has been ascertained.  Plaintiff therefore sues said Defendants

by such fictitious names.  Plaintiff is informed and believes and thereon alleges that each of the Defendants designated herein as a DOE is responsible in some manner for the events and happenings herein alleged and proximately caused and contributed to the injuries and damages to Plaintiff as hereinafter alleged.  Any subsequent reference to any named Defendant includes reference to said DOES 1 through 50, inclusive.  At all times herein mentioned, Defendants, and each of them, were the agents, servants and employees of each other, and of the remaining defendants, and in doing the things hereinafter alleged, were acting within the course and scope of their authority as agents, joint-venturers, servants and/or employees.

## COMPLIANCE WITH CALIFORNIA CLAIMS FILING REQUIREMENTS

15.    On August 25, 2015, Plaintiff filed a timely claim for damages with the County pursuant to the applicable sections of California Government Code § 900, et seq. The County did not act on Plaintiff's claim within forty-five (45) days.  Accordingly, it was deemed denied by operation of law pursuant to Government Code §§ 905, 905.2, and 945.4.  Plaintiff then filed the instant complaint within six (6) months of receiving notice that the County denied her claim by operation of law.

16.    Accordingly, Plaintiff has complied with all requirements of California Government Code §900, et seq., and this Complaint is timely.

## PRIOR MISCONDUCT BY THE SAN DIEGO SHERIFF'S DEPARTMENT

17.    Over the last 15 years, Department deputies have been involved in numerous incidents of wrongful arrest and excessive force. Many of these incidents are inadequately investigated and the deputies and officers involved are rarely, if ever, disciplined as a result of their misconduct. These cases demonstrate a pattern of abuse by Department deputies, and a failure by Gore and other supervisory and/or policy-making employees and officials within the Department to properly monitor, supervise, and train their subordinate deputies.

//

18.     Several recent examples are illustrative of this pattern of misconduct by the Department.

19.     First, on December 12, 2012, Department Deputy Jeffery Guy, illegally detained, physically assaulted, and arrested 21-year-old Antonio Martinez, who has Down Syndrome. Mr. Martinez was walking to his family's bakery where he worked, when, without reasonable suspicion or probable cause, Deputy Guy pulled his patrol car up next to Mr. Martinez and asked him to stop. When Mr. Martinez failed to do so, Deputy Guy jumped out of his car, ran into Mr. Martinez's path, and without any justification for using any amount of force, doused Mr. Martinez with pepper spray. Deputy Guy then began striking Mr. Martinez multiple times with a metal baton, taking the young man to the ground. As Deputy Guy continued to beat Mr. Martinez, Mr. Martinez's sisters and other bystanders screamed at the deputy to stop, yelling that Mr. Martinez has Down Syndrome.

20.     Deputy Guy then handcuffed Mr. Martinez and took him to a local hospital for X-rays and evaluation. Mr. Martinez had suffered facial abrasions to his nose and over his eye, and leg, arm and back pain with contusions. After the exam, Deputy Guy took Mr. Martinez to the Vista Sheriff's Station, where, despite numerous attempts by Mr. Martinez's family to see him, Mr. Martinez was kept away from his family for over five hours. Then, in an attempt to cover up his wrong doing, Deputy Guy then arrested Mr. Martinez on the false charge of resisting, delaying, obstructing an officer in performance of his duties, a charge that was dropped the following day. The Department did not terminate Deputy Guy's employment over the incident, not did it discipline him in any way.

21.     Second, as a result of the Department's failure to adequately discipline Deputy Guy, this deputy was involved in an additional incident in which he used unlawful and excessive force against college student Brett Bacon.

//

//

22.   In February 2013, several Department deputies, including Deputy Guy, responded to a Vista residence to investigate a 911 call. Mr. Bacon's girl friend had made the 911 call approximately 10 hours earlier during a mental health episode. Mr. Bacon was being dropped off at his home by a friend. When he arrived, he notice several Department deputies, who told Bacon to get out of the car. The deputies ripped the car door open and pulled Mr. Bacon's hands over his head, before forcing Mr. Bacon onto the ground on his stomach.

23.   Although Mr. Bacon repeatedly asked the deputies why the deputies were doing this to him, the deputies refused to respond. Deputy Bacon then used his boot to stomp Mr. Bacon's head into the asphalt. Deputy Bacon then place Mr. Bacon ibn his patrol car. When Mr. Bacon confronted Deputy Guy about stomping on his head, Deputy Guy responded that "I'm going to tell them you fell out of the car on your face." Deputy Guy then arrested Mr. Bacon on the false charge of resisting, delaying, obstructing an officer in performance of his duties, a charge that was dropped approximately a month later.

24.   Third, in January 2014, Department deputies used excessive force while attempting to serve an arrest warrant on Michael Napier.  During the incident, two Department deputies unlawfully and excessively fired approximately 15 rounds at Mr. Napier, who was unarmed at the time.  Seven rounds struck Mr. Napier, resulting in Mr. Napier's death.  Two additional Department deputies who were present and did not fire their weapons.  Following the shooting, Department deputies then made false statements in an attempt to cover up their wrongdoing.

25.   Fourth, on June 26, 2014, Department deputies responded to a complaint that a group of men had threatened a woman. A Department deputy spotted Marcial Torres, whom the deputy claimed matched the description of the suspect.  The deputy then approached Mr. Torres and, despite the fact that Mr. Torres was unarmed and was not in any way threatening the deputy, the deputy deployed his TASER on Mr. Torres repeatedly and excessively. Mr. Torres suffered a heart attack as a result of the deputy's

excessive use of the TASER. Despite the fact that Mr. Torres was not breathing, was blue in the face, and was foaming from the mouth following the deputy's unnecessary and excessive use of the TASER, the deputy, along with other deputies who were present, failed to render <u>any</u> aid to Mr. Torres.

26.    Paramedics eventually arrived, resuscitated Mr. Torres, and transported him to Tri-City Hospital, where Mr. Torres remained in critical condition for several weeks, ultimately falling into a vegetative state. The multiple electrical charges from the TASER resulted in permanent damage to Mr. Torres's kidneys and brain, and forced doctors to amputate Mr. Torres' legs and several of his fingers. Following the incident, Sheriff's deputies made false statements in an attempt to cover up their wrongdoing.

27.    Fifth, on August 15, 2014, Devin Whitaker, was standing at a Lemon Grove trolley station waiting to catch a trolley to a San Diego Chargers game. At the same time, numerous law enforcement officers, including Department deputies, were performing a sweep of the trolley station and were looking for individuals to arrest. When several Department deputies saw Mr. Whitaker, a 23-year-old young man with dreadlocks, they thought he fit a "profile" of someone who might have illegal drugs. Accordingly, without probable cause or reasonable suspicion, several Department deputies illegally seized, detained, and searched Mr. Whitaker. These Department deputies did <u>not</u> find any illegal drugs. In fact, Mr. Whitaker did not have <u>anything</u> illegal on him.

28.    Nevertheless, the Department deputies grabbed Mr. Whitaker by the wrists, dropped him to the ground, split open his face, handcuffed him, hauled him off to jail, and then – not surprisingly – charged him with three crimes in an effort to cover up their wrongdoing:  possession of a controlled substance, possession of illegal paraphernalia, and obstructing/resisting a peace officer. The first two charges (possession of a controlled substance and possession of illegal paraphernalia), were based upon a meth pipe that these Department deputies "found" at the trolley station. A meth pipe that <u>no one</u> saw Mr. Whitaker holding (let alone dropping or throwing) at any point.

29.     Although the District Attorney dutifully filed charges against Mr. Whitaker, and attempted to get him to plead guilty to anything in order to avoid a civil lawsuit, as is often the case when Department deputies arrest citizens on bogus charges in an effort to cover up their own misconduct, when Mr. Whitaker refused to plead guilty and insisted on going to trial, the District Attorney dismissed all charges against Mr. Whitaker on the morning of trial.

30.     Sixth, on April 13, 2015, Lucky Phounsy began experiencing symptoms of a mental health crisis, including paranoid delusions that someone was going to harm him and his family.   Mr. Phounsy called 911 for help and several Department deputies responded. Unfortunately, rather than rendering aid to Mr. Phounsy, the deputies that responded were confrontational, aggressive, profane, refused to answer Mr. Phounsy's questions, and insisted on physically restraining Mr. Phounsy from the moment they arrived.

31.     The Department deputies' actions escalated an already tense, though under control, situation.   As a result, Mr. Phounsy became increasingly agitated and the deputies began using unlawful, unreasonable, and unnecessary physical force on Mr. Phounsy.   Using punches and baton strikes at first, the Department deputies ultimately shot Mr. Phounsy three times with a TASER.   Mr. Phounsy retreated, after each affront, to family members who were present and able to calm Mr. Phounsy with reassuring words and gestures.

32.     Ultimately, Department deputies hogtied Mr. Phounsy and carried him out of the house, hidden from his family's view.   Before Mr. Phounsy was loaded into an ambulance, he was possibly given multiple doses of a chemical sedative.   Paramedics allowed the sedated Mr. Phounsy to remain hogtied while en route to the hospital. Before arriving at the hospital, Mr. Phounsy's heart stopped.   While emergency room staff was, after several minutes, able to restart Mr. Phounsy's heart, Mr. Phounsy died a few days later as a result of his encounter with deputies and paramedics.

//

33.     Seventh, on May 27, 2015, Department deputies tased, shot, and killed Simon D. Hubble, an individual who was considered suicidal and who may have been armed with nothing more than a screwdriver.

34.     Eighth, in July 12, 2015, at the Harrah's Resort in San Diego, Department deputies brutally beat hotel guest Jovan Jimenez. Hallway security footage captured the entire incident.

35.     The footage shows Mr. Jimenez, who is hand-cuffed behind his back, being walked down a resort hallway by several Department deputies, including deputy Jeffery Cruz. Deputy Cruz then violently and without any legal justification, grabs Mr. Jimenez by the throat, slams him into the wall, and then throws him to the ground; all while Mr. Jimenez is still handcuffed behind his back.

36.     Then, while Mr. Jimenez was lying face-first on the hallway floor, Deputy Cruz pulls out his large flash light and strikes Mr. Jimenez in the head with great force, casing a large gash on Mr. Jimenez's head and knocking Mr. Jimenez unconscious. Then, in an effort to cover up his misconduct, Deputy Cruz arrested Mr. Jimenez for resisting, delaying, obstructing an officer in performance of his duties.

## **FACTS**

37.     On the morning of March 27, 2015, Gary and Cindy were in their home located in Encinitas, CA. Cindy saw Gary, who had been struggling with depression, holding his shotgun. Cindy feared for Gary's safety and immediately dialed 911. Gary told Cindy if she called the police, he was going to kill himself, so Cindy immediately hung up before speaking to anyone.

38.     Gary pointed the shotgun toward his face and pulled the trigger, but the gun had apparently jammed. Cindy then saw their neighbor Ryan Ward ("Ryan") walk by the house.  She ran outside to tell Ryan that Gary was suicidal and trying to kill himself.  It was at this time that Gary and Cindy noticed that cops had arrived outside of their residence.

//

39.     During this time, Ryan had spoken to an officer outside of the residence and informed him that Gary had a shotgun and was suicidal.

40.     Gary walked out of the residence with his arms outstretched and then stood still several feet from the front door of the residence. He was holding a bottle of vodka in his left hand and was holding the shotgun by the barrel outstretched in his right hand. Gary did not have his hand near the shotgun's trigger and, as a result, could not have fired the weapon from the position with which he was holding the weapon. Gary shouted to the officers "Bring it on, mother fuckers!" all while keeping his arms outstretched.

41.     One officer told Gary to drop his weapon and within seconds Department Deputy Block ran onto the scene with an AR-15 and quickly fired two bullets at Gary. One bullet struck Gary, causing him to drop the gun and fall towards the ground, while the second bullet entered into the bedroom of a home several yards away. Seconds later, Deputy Block fired two more bullets, again striking Gary and ultimately killing him.

42.     At no time did Gary point his shotgun at the deputies, or anyone else, and no reasonable officer in the deputies' position would have fired his or her weapon at Gary at that time.

43.     All deputies present at the scene knew or should have reasonably known that Gary was suffering from a psychiatric emergency and exhibited signs that he was prepared to commit suicide.

44.     Defendants took no other measures besides an AR-15 to subdue Gary.

45.     Defendants had the reasonable opportunity and means to restrain Gary but did not. Even after the initial shot, which incapacitated Gary and caused him to drop to the ground, Deputy Block still chose to fire two more shots at Gary.

46.     Plaintiff watched her husband die feet away from her and when she attempted to go to him Department deputies pulled Plaintiff away and put her in a locked police vehicle with the windows up despite her cries to be released to get air. Plaintiff suffered severe emotional distress as a direct result of the involved Defendants' misconduct described herein.

47.     The actions and omissions of Defendants were objectively unreasonable under the circumstances, without legal justification or other legal right, done under the color of state law, within the course and scope of their employment as law enforcement officers and/or public officials, and pursuant to unconstitutional customs, policies and procedures of the County of San Diego.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 – Excessive Force

**(By Gary's Successor Against County and Deputy Block, and Unknown Department Deputies)**

48.     All preceding paragraphs are incorporated by this reference.

49.     Cindy asserts this claim as Gary's successor in interest.

50.     Deputy Block and other currently unknown Department deputies violated the Fourth Amendment when, on March 27, 2015, they unnecessarily escalated a situation upon their arrival, and then used unreasonable and excessive force on Gary by shooting Gary multiple times with an assault rifle even though he posed no immediate threat to those present.

51.     As a direct and foreseeable result of these deputies' unreasonable and excessive uses of force, Gary died.  Gary therefore suffered special and general damages, including those arising from Gary's pre-death pain and suffering, along with further damages according to proof at the time of trial.

52.     In using the force described above, these deputies recklessly disregarded Gary's constitutional rights.  As such, these deputies' actions justify an award of punitive damages in an amount to be determined at the time of trial.

53.     Because the deputies acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by their conduct pursuant to California Government Code section 815.2.

//

//

COMPLAINT                                        11

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 – Denial of Medical Care

### (By Gary's Successor in Interest Against County, Deputy Block, and Unknown Department Deputies)

54.     All preceding paragraphs are incorporated by this reference.

55.     Cindy asserts this cause of action as Gary's successor in interest.

56.     In failing to provide Gary the medical attention he needed, the individual deputies violated Gary's Fourteenth Amendment right to due process by being deliberately indifferent to Gary's serious medical needs.  Those present exacerbated the mental health crisis Gary was experiencing, in that they were immediately confrontational and used no means of persuasion or force less than deadly force upon arrival.  Deputy Block further failed to render medical care after he first shot and neutralized Gary by firing additional shots at Gary, ensuring that he had killed Gary.

57.     As a direct and foreseeable result of these deputies' unreasonable and excessive uses of force, Gary died.  Gary therefore suffered special and general damages, including those arising from Gary's pre-death pain and suffering, along with further damages according to proof at the time of trial.

58.     In exacerbating Gary's serious medical needs, these deputies recklessly disregarded Gary's constitutional rights.  As such, these deputies' actions justify an award of punitive damages in an amount to be determined at the time of trial.

59.     Because the deputies acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by the deputies' conduct pursuant to California Government Code section 815.2.

//

//

//

//

### THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983 – <u>Monell</u>

### (By Gary's Successor in Interest Against County)

60.     All preceding paragraphs are incorporated by this reference.

61.     Cindy asserts this cause of action as Gary's successor in interest.

62.     The County is liable for the deprivation of Gary's constitutional rights under <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658 (1978), and its progeny, which hold that municipal entities may be held liable for violations of Constitutional rights committed by its employees if the violations arose from:

      a.     a widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a custom or usage" with the force of law;

      b.     the ratification of the illegal and unconstitutional conduct by an individual with final policy-making authority; and/or

      c.     a failure to adequately train municipal employees resulting in the deliberate indifference to the constitutional rights of citizens.

63.     The County is liable under <u>Monell</u>, in that Gary's death was not only a result of an unconstitutional practice or custom (namely, a practice or custom of using excessive and unreasonable force on individuals in the midst of a mental health crisis), it was also the result of a failure to train deputies to appropriately deal with such individuals.  Indeed, the uniformity in which multiple deputies acted in reckless disregard of Gary's rights demonstrates the existence of such a practice or custom, and lack of adequate training.  Moreover, upon learning of the conduct giving rise to Gary's death, the County's final policymakers (including Sheriff Gore) ratified the conduct, approved it, and imposed no discipline because of it.

64.     As a direct and legal result of the County's systematically unconstitutional acts and omissions, Gary died.  Gary therefore suffered special and general damages, including those arising from Gary's pre-death pain and suffering, along with further

1   damages according to proof at the time of trial.

## FOURTH CAUSE OF ACTION

### Battery

### (By Gary's Successor in Interest Against County and Deputy Block)

65.    All preceding paragraphs are incorporated by this reference.

66.    Cindy asserts this cause of action as Gary's successor in interest.

67.    Deputy Block used unreasonable and excessive force on Gary when he shot Gary multiple times despite the fact that Gary posed no immediate threat to those present. Because this use of force on Gary was without legal justification, it was tortious.

68.    Gary did not, at any time, consent to Deputy Block using any kind of force on him.

69.    As a direct and foreseeable result of Deputy Block's use of force, Gary died. Gary therefore suffered special damages, along with further damages according to proof at the time of trial.

70.    Deputy Block's conduct was a substantial factor in causing Gary's injuries.

71.    Because Deputy Block acted in the scope of his employment, the County is vicariously liable for the harm proximately caused by Deputy Block's conduct pursuant to California Government Code section 815.2.

## FIFTH CAUSE OF ACTION

### Cal. Civ. Code § 52.1 – Bane Act

### (By Gary's Successor in Interest Against County, Deputy Block, and Unknown Department Deputies)

72.    All preceding paragraphs are incorporated by this reference.

73.    Cindy asserts this cause of action as Gary's successor in interest.

74.    Deputy Block and currently unknown Department deputies interfered, or attempted to interfere, with Gary's rights under the U.S. and California Constitutions to be free from unreasonable seizures and uses of force, including situations where the use of force is a result of unnecessary escalation by law enforcement officers.

75.     Gary could reasonably believe that, if he exercised his rights, the responding deputies would commit violence against him.  Indeed, Deputy Block did commit violence against Gary when, immediately upon arrival, Deputy Block shot Gary multiple times with an assault rifle even though Gary posed no immediate threat to those present.

76.     As a direct and foreseeable result of these deputies' actions, Gary died. Gary therefore suffered special damages, along with further damages according to proof at the time of trial.

77.     Because the deputies acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by the deputies' conduct pursuant to California Government Code section 815.2.

## SIXTH CAUSE OF ACTION

### 42 U.S.C. § 12132 – Americans with Disabilities Act

### (By Gary's Successor in Interest Against County, Deputy Block, and Unknown Department Deputies)

78.     All preceding paragraphs are incorporated by this reference.

79.     Cindy asserts this cause of action as Gary's successor in interest.

80.     On March, 27, 2015, Gary had a disability as defined in 42 U.S.C. § 12102. At a minimum, the Department deputies that responded to Cindy's 911 call perceived Gary as suffering from such a disability.

81.     When deputies arrived, no one was in immediate danger, as Gary was holding a firearm by the barrel with arms outstretched.  Instead of attempting to de-escalate the situation, Deputy Block and other currently unknown deputies came in with "guns blazing."

82.     The responding deputies acted aggressively toward Gary because of his actual or perceived disability.  That is, these deputies discriminated against Gary because of Gary's actual or perceived disability.  This unnecessary escalation of an already delicate situation, along with the repeated use of an assault rifle, ultimately caused Gary's death.

83.     Title II of the ADA provides that the responding deputies had a duty to make reasonable accommodations in dealing with Gary, including, for example, being civil and respectful upon first contact.  <u>See</u> 42 U.S.C. § 12182(b)(2)(A).  These deputies failed to comply with this duty.

84.     As a direct and foreseeable result of these deputies' actions, Gary died. Gary therefore suffered special damages, along with further damages according to proof at the time of trial.

85.     Because the deputies acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by the deputies' conduct pursuant to California Government Code section 815.2.

<u>**SEVENTH CAUSE OF ACTION**</u>

**Cal. Civ. Code §§ 51, 51.7 – Unruh Civil Rights Act**

**(By Gary's Successor in Interest Against the County, Deputy Block, and Unknown Department Deputies)**

86.     All preceding paragraphs are incorporated by this reference.

87.     Cindy asserts this cause of action as Gary's successor in interest.

88.     To the extent Gary's rights under the ADA were violated, Gary's rights under the Unruh Civil Rights Act were also violated.  <u>See</u> Cal. Civ. Code § 51(f).

89.     On March 27, 2015, Gary suffered from a mental disability as defined by California Civil Code section 51(d)(1) and California Government Code section 12926(j). At a minimum, the Department deputies that responded to Cindy's 911 call perceived Gary as suffering from such a mental disability.

90.     The responding deputies acted aggressively toward Gary because of his actual or perceived mental disability.  This unnecessary escalation of an already delicate situation, along with repeated uses of an assault rifle, ultimately caused Gary's death.

91.     As a direct and foreseeable result of these deputies' actions, Gary died. Gary therefore suffered special damages, along with further damages according to proof at the time of trial.

92.     The responding deputies' conduct was a substantial factor in causing Gary's death.

93.     Because the deputies acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by the deputies' conduct pursuant to California Government Code section 815.2.

<u>**EIGHTH CAUSE OF ACTION**</u>

**Negligence**

**(By Gary's Successor in Interest Against County, Deputy Block, and Unknown Department Deputies)**

94.     All preceding paragraphs, except those falling under the First through Seventh Causes of Action are incorporated by this reference.

95.     Cindy asserts this cause of action as Gary's successor in interest.

96.     The Department deputies who interacted with Gary on March 27, 2015, owed Gary a duty of ordinary care and skill.

97.     The responding deputies breached this duty when they unnecessarily escalated a situation and resorted to the use of an assault rifle upon first encountering Gary even though Gary posed no immediate threat to those present.

98.     As a direct and foreseeable result of these breaches of duty, Gary died.  Gary therefore suffered special damages, along with further damages according to proof at the time of trial.

99.     These defendants' negligence was a substantial factor in causing Gary's death.

100.    Because the responding deputies acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by the deputies' conduct pursuant to California Government Code section 815.2.

//

//

//

COMPLAINT                                    17

# NINTH CAUSE OF ACTION

## Negligent Hiring, Retention, Supervision

### (By Gary's Successor in Interest Against Sheriff Gore)

101.   All preceding paragraphs, except those falling under the First through Seventh Causes of Action, are incorporated by this reference.

102.   Cindy asserts this cause of action as Gary's successor in interest.

103.   Sheriff Gore had a duty to ensure those they hired, retained, and supervised were fit to perform their respective duties.

104.   Deputy Block and other currently unknown Department deputies were each unfit and/or incompetent to perform their respective duties as law enforcement officers.

105.   Sheriff Gore's subordinates were unfit and/or incompetent in a way that created a particular risk to the public, in that they demonstrated a lack of adequate knowledge with regard to dealing with individuals in the midst of a mental health crisis. Sheriff Gore should have known, prior to this incident, that his subordinates were unfit and/or incompetent, in that this is not the first instance in which deputies unnecessarily escalated situations involving mentally comprised individuals, resulting in the use of unreasonable and excessive force against such individuals.

106.   The unfitness and/or incompetence of Sheriff Gore's subordinates caused Gary's death, in that, had the responding deputies been fit and competent to deal with individuals in the midst of a mental health crisis, and had the responding deputies been trained to use a level of force commensurate with (and not greater than) the risk at hand, Gary would not have died.

107.   As a direct and foreseeable result of Sheriff Gore's failure to, with due care, hire, retain, and/or supervise his subordinates, Gary died.  Gary therefore suffered special damages, along with further damages according to proof at the time of trial.

108.   Because the responding deputies acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by these deputies' conduct pursuant to California Government Code section 815.2.

## TENTH CAUSE OF ACTION

### Wrongful Death

### (By Cindy Against All Defendants)

109.   All preceding paragraphs are incorporated by this reference.

110.   Cindy is, under California Code of Civil Procedure section 377.60, an individual authorized to bring a cause of action grounded in Gary's wrongful death, as Cindy was Gary's wife.

111.   As set forth in the First through Ninth Causes of Action, Gary died as a result of Defendants' tortious conduct.

112.   Gary's death caused a pecuniary loss to Cindy in that, as a direct and foreseeable result of Gary's death, Cindy has suffered economic and non-economic damages.  Cindy has lost the benefit of the financial support that Gary would have provided to her during the remainder of his life, or the remainder of Cindy's life, whichever is shorter.  Cindy has lost any gifts or other benefits she expected from Gary. Cindy has incurred funeral and burial costs.  Cindy has lost the reasonable value of household services that Gary would have provided.

113.   Cindy has lost Gary's love, companionship, comfort, care, assistance, protection, affection, society, and moral support.  Cindy has further lost the enjoyment of a romantic partner.

## ELEVENTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – Substantive Due Process

### (By Cindy Against All Defendants)

114.   All preceding paragraphs are incorporated by this reference.

115.   As set forth in the First through Ninth Causes of Action, Gary died as a result of Defendants' tortious conduct.

116.   As a result of Gary's death, Cindy was deprived of her Fourteenth Amendment right to familial companionship and society.  See, e.g., Smith v. City of Fontana, 818 F.2d 1411, 1419-20 (9th Cir. 1987).

117.   As a direct and foreseeable result of this denial of substantive due process, Cindy has suffered economic and non-economic damages.  Cindy has lost the benefit of the financial support that Gary would have provided to her during the remainder of his life, or the remainder of Cindy's life, whichever is shorter.  Cindy has lost any gifts or other benefits she expected from Gary.  Cindy has lost the reasonable value of household services that Gary would have provided.

118.   Cindy has lost Gary's love, companionship, comfort, care, assistance, protection, affection, society, and moral support.  Cindy has further lost the enjoyment of a romantic partner.

## TWELFTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### (By Cindy Against County, Deputy Block, and Unknown Department Deputies)

119.   All preceding paragraphs are incorporated by this reference.

120.   The conduct of the Department deputies that responded to Cindy's 911 call on March 27, 2015, was outrageous, in that these deputies unnecessarily escalated a tense situation and used an assault rifle to shoot and kill Gary even though Gary posed no immediate threat to those present.  These deputies did so while Cindy watched.  After killing Gary, these deputies locked Cindy in the back of a police cruiser with windows closed.

121.   These deputies acted with reckless disregard of the probability that their actions would cause Cindy severe emotional distress.

122.   Cindy suffered severe emotional distress, in that she experienced panic, hyperventilation, and profound distress as a result of the deputies shooting her husband to death.

123.   The responding deputies' conduct was a substantial factor in causing Cindy's severe emotional distress.

//

//

COMPLAINT                                                    20

124.   Because the deputies acted in the scope of their employment, the County is vicariously liable for the harm proximately caused by the deputies' conduct pursuant to California Government Code section 815.2.

## **PRAYER FOR RELIEF**

WHEREFORE, the foregoing allegations considered, Plaintiff demands:

(1)   that judgment be rendered in favor of Plaintiff and against Defendants on all causes of action asserted herein;

(2)   compensatory damages (including economic and noneconomic damages), in amounts to be determined at trial;

(3)   punitive damages, against the individual defendants only, and in an amount sufficient to deter and make examples out of these individuals, to be determined at trial;

(4)   reasonable attorney fees, expenses, and costs of suit pursuant to 42 U.S.C. §§ 1983-1988, California Civil Code §§ 52.1, et seq., and any other relevant statutory or case law; and

(5)   any and all other relief in law or equity to which Plaintiffs may be entitled and which this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands, under the Seventh Amendment, a trial by jury as to each and every cause of action asserted herein.


Respectfully submitted,

SINGLETON LAW FIRM, APC
KETTNER LAW CORP

By:   */s/ Gerald Singleton*
       Gerald Singleton, Esq.
       Brody A. McBride, Esq.
       Marc Applbaum, Esq.
Attorneys for Plaintiff