UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CYNTHIA KENDRICK, individually, and as successor in interest to her now deceased husband, GARY KENDRICK,

Plaintiff,

v.

COUNTY OF SAN DIEGO; SAN DIEGO COUNTY SHERIFF'S DEPARTMENT; San Diego Sheriff WILLIAM GORE; San Diego Sheriff's Deputy STEVEN BLOCK; and DOES 1 through 50,

Defendants.

Case No.: 15cv2615-GPC(AGS)[Title]

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**[Dkt. No. 70.]**

Before the Court is Defendants' motion for summary judgment on all causes of action against them alleged in the second amended complaint. (Dkt. No. 70.) Plaintiff filed an opposition on January 19, 2018. (Dkt. No. 75.) Defendants filed a reply on February 16, 2018. (Dkt. No. 79.) After a review of the briefs, the supporting documentation, and the applicable law, the Court GRANTS in part and DENIES in part Defendants' motion for summary judgment.

////

## Background

On November 20, 2015, Plaintiff Cynthia Kendrick ("Plaintiff" or "Cynthia"), in her individual capacity and as successor in interest to her deceased husband Gary Kendrick ("Gary") filed a complaint alleging numerous causes of action arising out of the shooting death of Gary by a Sheriff's Deputy of the San Diego County Sheriff's Department. (Dkt. No. 1.) On June 23, 2017, Plaintiff filed the operative second amended complaint ("SAC") against Defendants County of San Diego, Sheriff William Gore, Lieutenant Amy Brown-Lisk, Detective Troy Dugal, Detective Daniel Barnes, Detective Matthew Mays, Detective Dave Hillen, Sergeant Dustin Lopez, Deputy Steven Block, Deputy Jeremy Collis, Deputy Kevin Norie and Deputy Jason Worthington. (Dkt. No. 61.) She alleges the following causes of action: (1) 42 U.S.C. § 1983 - excessive force by Gary's Successor against the County and Deputy Block; (2) Monell claim by Gary's Successor against the County; (3) battery by Gary's Successor against the County and Deputy Block; (4) California Civil Code section 52.1 by Gary's Successor against the County and Deputy Block, (5) negligence by Gary's Successor against the County and Deputy Block; (6) negligent hiring, retention and supervision by Gary's Successor against Sheriff Gore; (7) wrongful death by Plaintiff as to all Defendants; (8) 42 U.S.C. § 1983 – substantive due process by Plaintiff against all Defendants;[1] (9) 42 U.S.C. § 1983 - unreasonable seizure by Plaintiff against Defendants Lieutenant Brown-Lisk, Detective Barnes, Detective Hillen, Sergeant Lopez, Deputy Norie, Deputy Collis and Deputy Worthington; and (10) 42 U.S.C. § 1983 - unreasonable search by Plaintiff against Detectives DuGal and Mays. (Id.)

////

////

---

[1] Plaintiff does not object to the voluntary dismissal of the substantive due process-claims for interference with familial relations. (Dkt. No. 75 at 13 n. 9.) Accordingly, the Court GRANTS Defendants' motion for summary judgment on the eighth cause of action as unopposed.

## Factual Background

On March 27, 2015, at 9:26 a.m., the Sheriff's Department received a 9-1-1 call from a phone number that corresponded to 2014 Shadytree Lane in Encinitas. (Dkt. No. 75-9, P's Response to Ds' SSUF, No. 1.) Nothing was heard during the call. (Id.) Deputy Norie arrived near 2015 Shadytree Lane in Encinitas at 9:34 a.m. (Id., No. 2.) While driving to that location, Deputy Block heard Deputy Norie's radio transmission that a male with a shotgun said he would shoot someone, or would kill himself. (Id.; Dkt. No. 70-6, Ds' NOL, Ex. C, Radio Traffic at 6.) However, Deputy Block did not hear the other radio transmissions because his vehicle's radio transmission had been giving him problems. (Dkt. No. 75-1 McBride Decl., Ex. F, Block Depo. at 40:1-41:23.) He testified he was not sure if he missed any other radio calls as he was en route to Shadytree Lane. (Id. at 41:15-23.) According to the radio call transcript, Sheriff deputies were at the residence on Monday as Gary was throwing his property outside the house. (Dkt. No. 70-6, Ds' NOL, Ex. C, Radio Traffic at 8.) The transcript also indicated that based on the previous incident's call on March 24th there were numerous weapons in the house that should be in a safe, that Gary was upset, throwing things around the house, possibly owned 15 guns and kept a shotgun under his bed. (Id.)

Deputy Block arrived at the scene at around 9:39 a.m. (Dkt. No. 79-2, Ds' Response to P's Add'l Facts, No. 49.) When Deputy Block arrived, he got out of his vehicle wearing two ballistic vests, took an AR-15 with him, and charged his rifle while walking towards Deputy Norie who was talking with a man. (Dkt. No. 75-1, McBride Decl., Ex. F, Block Depo. at 50:25-51:15; 70:5-18.) As he walked past Deputy Norie, Deputy Block asked him for the location of the residence. (Id. at 72:1-73:2; 74:14-25; Dkt. No. 75-1, McBride Decl., Ex. E, Norie Depo. at 57:7-11; 58:21-59:5.) Deputy Norie pointed down in the north direction and said it was around the corner. (Dkt. No. 75-1, McBride Decl., Ex. F, Block Depo. at 72:25-73:3; Dkt. No. 75-1, McBride Decl., Ex. E, Norie Depo. at 59:1-6.)

Deputy Block testified he did not know anything about Gary at the time of the incident but earlier in the week, on Wednesday, he had been briefed about the incident on March 24th at a meeting. (Dkt. No. 75-1, McBride Decl., Ex. F, Block Depo. at 63:3-64:11.) At the meeting, Deputy Block learned that deputies responded to a domestic disturbance call on Monday where the husband was throwing items of clothing outside the home because he had caught the wife having an extramarital affair inside the home and it was noted that there were multiple guns on the property. (Id.)

Deputy Block arrived at the corner of a row of garages and saw a male, who later was identified as Gary, sitting in the grass. (Dkt. No. 70-5, Ds' NOL, Ex. B, Block Depo. at 93:9-23.) At 9:41 a.m., plus 7 seconds, Deputy Block saw Gary on the grass leaning backwards with a shotgun in his left hand with a barrel pointed upwards near his face. (Id. at 95:10-20; 103:5-10; 104:7-13.) When Gary heard Deputy Block "key up [his] radio", he jumped up and rose to his feet. (Id. at 106:18-107:6.) Deputy Block commanded the man to stay where he was and to put the gun down. (Id. at 112:6-113:20; 121:10-21.) The man was also yelling at the same time to shoot him. (Id. at 112:12-113:5.)

Then, as Gary began to step towards Deputy Block and the barrel starting swinging towards Block as Gary's right hand started moving towards the pistol grip of the shotgun, Deputy Block shot at Gary with three shots. (Dkt. No. 70-5, Ds' NOL, Ex. B, Block Depo. at 128:10-22; 140:8-22.) When Gary was shot, he was already committed to going into a shooting stance. (Id. at 135:23-136:6.) Two of the shots struck an exterior of a residence and another penetrated the wall, went through a bed, went through a closet and rested in a hallway. (Dkt. No. 75-1, McBride Decl., Ex. F at 193:15-25.)

Deputy Block testified he began shooting "maybe two minutes" upon arriving on the scene. (Dkt. No. 75-1, McBride Decl., Ex. F at 141:2-12.) About five or six seconds passed from when he arrived at the corner and his first shot. (Id. at 141:13-19.)

15cv2615-GPC(AGS)

Cynthia Kendrick, the only other witness to the incident, presents different facts than testified to by Deputy Block. Cynthia states that Gary never took a "shooter's stance" when confronted by Block. (Dkt. No. 75-2, Kendrick Decl. ¶ 12.) Instead, when Deputy Block began firing, Gary was facing Deputy Block, standing in a cross pose, with his arms outstretched and near parallel with the ground holding a bottle of vodka in his right hand and the barrel of the shotgun in his left hand.[2] (Id. ¶ 13.) Cindy states her husband did not swing or aim the shotgun towards Block and never had his hand near the trigger of the shotgun. (Id. ¶ 14.) The only motion he might have made was dropping the vodka bottle before Deputy Block starting shooting. (Id.) Her husband did not lower his arms from a parallel position before Deputy Block began shooting. (Id.) When Gary was shot, the shotgun flew from his right hand and away from the body and he never regained possession of the shotgun before he died. (Id. ¶ 15.)

According to Deputy Block, Gary was still standing after the first shot and fell backwards after the third shot. (Dkt. No. 70-5, Ds' NOL, Ex. B, Block Depo. at 137:20-138:2.) As he lay on his back, his left arm was outstretched, and he still had the shotgun "kind of across his forearm and onto his left hand." (Id. at 144:3-10.) Deputy Block fell on his knees for a short second after being in shock at what had happened. (Id. at 145:19-24.) Then Deputy Block saw Gary sit up quickly with the shotgun in his hand and began turning his body to put it in a seated shooting position and moving his right hand towards the pistol grip and then Block got back up and fired his fourth shot. (Id. at 153:5-154:5; 155:8-22; 159:3-16.) Then Gary fell forward with his face down, halfway between being fully on his side and fully on his stomach with his butt a little in the air and legs bent and with left hand cradling over the top of his shotgun. (Id. at 160:11-162:22.)

---

[2] Cynthia's declaration includes conflicting facts concerning which hand was holding the shotgun and the liquor bottle. Paragraph 13 states that Gary was holding a bottle of vodka in his right hand and the barrel of the shotgun in his left hand while paragraph 8 states that Gary was holding the barrel of the shotgun with his right hand and a bottle of vodka in his left hand. (Dkt. No. 75-2, Kendrick Decl. ¶¶ 8, 13.)

Mr. Kendrick's blood alcohol content was measured at .28% after the shooting which is more than three times the legal limit to drive. (Dkt. No. 79-2, Ds' Response to P's Add'l Facts, No. 51.) At 9:45 a.m., deputies approached Gary and at 9:46 a.m. fire department medical personnel approached him. (Dkt. No. 79-1, P's Response to Ds' SSUF, No. 13.)

**B. Facts as to Cindy Kendrick**

After the fourth shot, Cynthia ran towards Gary's body but Deputies Norie and Block yelled at her to get back and she complied. (Dkt. No. 70-5, Ds' NOL, Ex. B, Block Depo. at 162:6-22.) But then a few seconds later she ran again towards Gary again and the deputies told her to "Get back." (Id.) The second time, she hugged or cradled Gary or held on to his body for about two seconds. (Id. at 166:15-167:8.)

Deputy Norie and another deputy escorted Cynthia away from the scene. (Dkt. No. 75-2, Kendrick Decl. ¶ 18.) When Deputy Collis appeared on the scene he saw Deputy Norie standing and Cynthia sitting on the ground, visibly upset. (Dkt. No. 70-8, Ds' NOL, Ex. E, Collis Depo. at 29:6-21.) Deputy Collis thought they should move her away from the people gathering to a more comfortable location. (Id. at 31:1-9.)

Deputy Norie walked her to a patrol vehicle and put her in the back seat, closed the door and walked away. (Id. at 37:3-5.) The patrol vehicle's rear door could not be unlocked from the inside when closed so after a few minutes, Deputy Collis noticed that the doors were closed, he opened the door back up to make sure she had air. (Id. at 37:4-10; 39:22-40:6.) In fact, a neighbor asked Deputy Collis if he could roll the windows down for Cynthia. (Id. at 40:23-25.) In contrast, Cynthia states when she was put in the patrol vehicle, she requested to get fresh air but Deputies Norie and Collis ignored her requests and were not present for most of the time and door was not open. (Dkt. No. 75-2, Kendrick Decl. ¶ 18.)

Around 10:08 am, Sergeant Lopez directed Deputy Collis to drive Deputy Norie and Cynthia to the station together. (Dkt. No. 79-2, Ds' Response to P's Add'l Facts, No. 75.) At the station, Lieutenant Brown-Lisk directed Deputy Worthington to be with

6

Cynthia until homicide detectives could interview her. (Dkt. No. 75-1, McBride Decl., Ex. J, Brown-Lisk Depo.at 37:1-6.) Deputy Worthington took custody of Cynthia until he transferred custody to Detectives Barnes and Hillen at 1:00 p.m. (Dkt. No. 75-1, McBride Decl., Ex. I, Worthington Depo. at 53:20-23.) The detectives interviewed Cynthia and photographed her and she did not leave the station until around 4:30 p.m. (Dkt. No. 75-2, Kendrick Decl. ¶ 26.)

**C.    Search Warrant**

Detective Mays wrote the search warrant and assisted in the search. (Dkt. No. 75-9, P's Response to Ds' SSUF, No. 32.) Detective DuGal instructed Mays to request the search warrant of the Kendrick residence, two nearby residences struck by bullets, Gary Kendrick's car, his garage, trash cans and outbuildings. (Id., No. 33.) After Judge Bowman issued the search warrant, Detective Mays informed Detective DuGal by phone and drove to the Kendrick residence around 4:35 p.m. and the search was completed about 9:00 p.m. (Id., No. 36.) Cynthia was allowed to return to her residence around 10:00 p.m. (Dkt. No. 79-2, Ds' Response to P's SSUF No. 90.)

**Discussion**

**A.    Legal Standard on Motion for Summary Judgment**

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. Celotex Corp., 477 U.S. at 323. The moving party can

satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. Id. at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. Id. at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. Anderson, 477 U.S. at 255.

**B.    First Cause of Action – 42 U.S.C. § 1983 - Excessive Force**

Plaintiff alleges an excessive force claim against the County[3] and Deputy Block alleging Deputy Block unnecessarily escalated the situation upon arrival and used unreasonable and excessive force by shooting Gary multiple times with an assault rifle even though he did not pose an immediate threat to those present. (Dkt. No. 61, SAC ¶ 74.)

---

[3] Defendants argue that the County cannot be liable on a claim of excessive force because there is no respondeat superior liability under § 1983. Plaintiff does not address this issue. Because there is no respondeat superior under § 1983, the Court GRANTS Defendants' motion for summary judgment as to the County. See Monell v. New York City Dep't of Social Servs., 436 U.S. 658 (1978).

8

In their motion, Defendants argues that Deputy Block cannot be liable for excessive force because Gary posed an immediate danger to him and others by engaging into a "shooter's stance." Plaintiff argues there are disputed issues of material fact whether Gary engaged into a "shooter's stance" when he was shot.

Section 1983 provides a plaintiff with a cause of action when a person acting under the color of state law deprives them of any federal constitutional right. 42 U.S.C. § 1983. "[A]prehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. 1, 7 (1985). An excessive force claim in the course of a law enforcement's "seizure" is analyzed under the Fourth Amendment's "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 388 (1989). Objective reasonableness is determined "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. "The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Id. at 396. Use of lethal force is justified if there is "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Garner, 471 U.S. at 11. "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." Id. at 11-12.

In sum, an officer's use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Garner, 471 U.S. at 3; Scott v. Harris, 550 U.S. 372, 383 (2007). Reasonableness of a seizure is determined by balancing the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." United States v. Place, 462 U.S. 696, 703 (1983). The "standard requires us to balance the amount of

force applied against the need for that force." <u>Deorle v. Rutherford</u>, 272 F.3d 1272, 1279 (9th Cir. 2001).

The Ninth Circuit has enunciated a three step analysis in determining whether a seizure is objectively reasonable. "First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" <u>Glenn v. Washington Cnty.</u>, 673 F.3d 864, 871 (9th Cir. 2011) (citations omitted). Second, "we evaluate the government's interest in the use of force." <u>Id.</u> (citation omitted). Finally, "we balance the gravity of the intrusion on the individual against the government's need for that intrusion." <u>Id.</u> (citation omitted).

Here, Gary was shot and killed by a rifle which constitutes a severe intrusion on his Fourth Amendment rights. <u>See</u> <u>Garner</u>, 471 U.S. at 9 ("The intrusiveness of a seizure by means of deadly force is unmatched."). Next, the government's interest in the force used is determined by assessing (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape. <u>Id.</u> (citing <u>Graham</u>, 490 U.S. at 396). Courts may also consider other relevant factors such as "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." <u>Id.</u> at 872.

"Because [the excessive force inquiry] nearly always requires a jury to sift through factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." <u>Santos v. Gates</u>, 287 F.3d 846, 853 (9th Cir. 2002); <u>see also</u> <u>Torres v. City of Madera</u>, 648 F.3d 1119, 1125 (9th Cir. 2011); <u>Smith v. City of Hemet</u>, 396 F.3d 689, 701 (9th Cir. 2005).

Here, the facts are clearly disputed as to Gary's physical position right before Deputy Block shot him by the two witnesses to the shooting. On one hand, Defendant Deputy Block testified that Gary initially had his shotgun barrel pointed upwards near his

face and when he heard Deputy Block, he stood up and then started to swing the barrel of the shotgun towards Deputy Block and his hand began moving towards the pistol grip of the shotgun.  As Gary moved into a "shooter's stance", Deputy Block shot him three times. Then after Gary fell backwards, he quickly sat back up and started moving into a seated shooting position when Block fired the final, fatal shot.  Therefore, according to Deputy Block, he reasonably perceived an immediate threat to his safety as well as to others.  On the other hand, Cynthia declares that when Gary left the back yard, his arms were outstretched with the shotgun in his right hand and a large partly empty plastic bottle of vodka in his left hand.  (Dkt. No. 75-2, Kendrick Decl. ¶ 8.)  When Deputy Block got the attention of Gary, they both started yelling at each other and within seconds, Deputy Block fired his gun.  (Id. ¶¶ 10, 11.)  When Deputy Block began shooting, Gary was standing in a cross pose, with his arms outstretched and near parallel to the ground.  (Id. ¶ 13.)  She states that Gary never swung his arms or aimed the shotgun towards Deputy Block and did not take a "shooter's stance."  (Id. ¶ 14.)  Gary might have dropped the vodka bottle before Deputy Block began firing.  (Id.)  According to Cynthia, the shooting caused the shotgun to fly from her husband's right hand and away from the body and he never regained possession of the shotgun before he died.  (Id. ¶ 15.)  She claims Gary did not pose a significant threat of serious physical injury to anyone.  A disputed issue of material facts exists as to whether Gary posed an "immediate threat to the safety of the officers or others."

Moreover, Defendants have not asserted that Gary had committed a crime or that he was actively resisting arrest or trying to evade arrest by fleeting.  See Garner, 471 U.S. at 9.  Here, the only witnesses to the shooting were Deputy Block and Cynthia Kendrick and both tell starkly different accounts of what happened.  As such, Plaintiff has raised a genuine issue of material fact as to whether there was probable cause that Gary posed a significant threat of death or serious physical injury to Deputy Block or others.  See Garner, 471 U.S. at 3, 11.  The Court DENIES Defendants' motion for summary judgment on the excessive force claim.

15cv2615-GPC(AGS)

**C.      Second Cause of Action - <u>Monell</u> Claim**

The SAC alleges that the County is liable for an unconstitutional practice or custom of using excessive and unreasonable force on "individuals in the midst of a mental health crisis" and also for its failure to train deputies to appropriately deal with such individuals.  (Dkt. No. 61, SAC ¶ 80.)  In their motion, Defendants contend that Plaintiff cannot demonstrate a disputed issue of material fact that the County had an unconstitutional policy and whether it failed to train its officers.[4]  Plaintiff opposes arguing that she has demonstrated an issue of fact whether the County failed to train its employees adequately.[5]  The County's failure to train its law enforcement officers to deal with mentally disturbed individuals without violating their constitutional rights reveals deliberate indifference on the part of the County, Sheriff Gore, and its policy makers and the failure to train was a substantial factor in causing Gary's death.

Cities, counties and other local government entities are subject to claims under 42 U.S.C. § 1983.  <u>Monell v. New York City Dep't of Social Servs.</u>, 436 U.S. 658 (1978). While municipalities, their agencies and their supervisory personnel cannot be held liable under § 1983 on any theory of respondeat superior or vicarious liability, they can, however, be held liable for deprivations of constitutional rights resulting from their formal policies or customs.  <u>Id.</u> at 691-93.  Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  <u>Id.</u> at 694.  Plaintiffs must establish that "the local government had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation [they] suffered."  <u>AE ex rel. Hernandez v. Cnty. of Tulare</u>,

---

[4] While Defendants assert there are two separate issues in the <u>Monell</u> claim, they only address the failure to train theory of liability.

[5] While the SAC also alleges a separate claim that the County had an unconstitutional policy, or custom, it is not clear whether Plaintiff is asserting a separate <u>Monell</u> claim based on an unconstitutional policy or custom separate from the failure to train.

666 F.3d 631, 636 (9th Cir. 2012) (citing Whitaker v. Garcetti, 486 F.3d 572, 581 (9th Cir. 2007)).

The Supreme Court has, in limited circumstance, held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989) ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."). A section 1983 plaintiff alleging a policy of failure to train peace officers must show: (1) he/she was deprived of a constitutional right; (2) the local government entity had a training policy that amounts to deliberate indifference to constitutional rights of persons with whom its peace officers are likely to come into contact; and (3) his/her constitutional injury would have been avoided had the local government unit properly trained those officers. Blankenhorn v. City of Orange, 485 F.3d 463, 484 (9th Cir. 2007). The standard "must demonstrate a 'conscious' or 'deliberate' choice on the part of a municipality in order to prevail on a failure to train claim." Flores v. Cnty. of Los Angeles, 758 F.3d 1154, 1158 (9th Cir. 2014). Mere negligence in training or supervision, however, does not give rise to a Monell claim. Dougherty v. City of Corvina, 654 F.3d 892, 900 (9th Cir. 2011). Deliberate indifference is a stringent standard that a municipal actor "disregarded a known or obvious consequence of his action", and can be demonstrated when "city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights . . . ." Connick v. Thompson, 563, U.S. 51, 61 (2011).

Typically, a plaintiff must demonstrate a pattern of similar constitutional violations to demonstrate deliberate indifference. Id. at 62. However, the U.S. Supreme Court left open the possibility of a "single incident" liability under a Monell claim in City of Canton, 489 U.S. at 390 n.10. In such a case, "it may happen that in light of the duties

assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. at 390. "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." Id.; Bd. of Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 409 (1997) (recognizing "single incident" liability). "A plaintiff [ ] might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where 'a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" Long v. Cnty. of Los Angeles, 442 F.3d 1178, 1186 (9th Cir. 2006).

In their motion, Defendants summarily argue that Plaintiff cannot demonstrate deliberate indifference or a direct causal link between the failure to train and the alleged constitutional violation. Plaintiff responds that she has submitted evidence that the deputies receive little training in handling individuals with mental health issues. The failure to train evinces deliberate indifference to the likelihood that the deputies will violate the constitutional rights of individuals who appear mentally disturbed. Although not articulated, it appears that Plaintiff is pursuing a theory of single incident liability under Monell as she has not provided any evidence of a pattern of similar constitutional violations.

Deputy Block testified that he took a class or had some training in dealing with people with mental disabilities in the academy. (Dkt. No. 75-1, McBride Decl., Ex. F, Block Depo. at 196:16-23.) He also took a one day, eight-hour Psychiatric Emergency Response Team ("PERT") class, in February 2014, where the class addressed the different types of mental disabilities but did not teach how officers are to handle situations where someone is suffering from mental health issues. (Id. at 197:2-198:5.) When asked whether the Sheriff's Department trains officers on how to approach an individual that is potentially mentally disturbed, Deputy Block responded that the

approach is the same as "any other pedestrian contact." (Id. at 219:6-16.) Deputy Block testified that he did not receive training on how to handle situations involving "suicide by cop" where an individual acts aggressively towards police officers in order to get the police officer to shoot him or her because the individual does not want to commit suicide. (Id. at 234:19-235:22.)

Deputy Lewis Norman-Hendersen, not a defendant, is a PERT deputy who has primary responsibility for all calls involving mental health. (Dkt. No. 75-1, McBride Decl., Ex. B, Norman-Hendersen Depo. at 32:5-12.) He attended a three-day PERT academy training and possibly some quarterly trainings. (Dkt. No. 75-1, Ex. D, Davies Depo. at 28:3-21.)

District courts have held that lack of any training or policies on how to handle mentally unstable individuals during the course of an officer's work creates a triable issue of fact whether such lack of training amounts to deliberate indifference. Kirby v. City of East Wenatchee, No. CV12-190-JLQ, 2013 WL 1497343, at *13 (E.D. Wash. Apr. 10, 2013) (denying summary judgment on Monell claim as there was a complete absence of any policy or training in handling with persons in a mental health crisis); Newman v. San Jaoquin Delta Comm. College Dist., 814 F. Supp. 2d 967, 978 (E.D. Cal. 2011) (despite plaintiffs' weak evidence to demonstrate failure to train theory, in drawing all inference in the plaintiffs' favor, the court concluded the failure to have any continuing education courses on handling mentally ill people and the absence of addressing the issue in the police manual creates triable issues whether the defendant's failure to train amounted to deliberate indifference and was the "moving force" behind the constitutional violations).

In Newman, the plaintiff offered a police expert who opined that, given how frequently police officers encounter mentally ill individuals, police officers should be trained on how to handle them. Meanwhile, the record disclosed that the defendant did not provide such training or a police manual policy addressing how to handle mentally ill people. See Newman, 814 F. Supp. 2d at 977. In Kirby, the plaintiff provided data on the relative frequency with which the City's officers encountered mentally ill individuals,

and a police practices expert who observed that law enforcement's response to mental ill people has become an issue of national concern. <u>Kirby</u>, 2013 WL 1497343, at *13.

To support the <u>Monell</u> claim, Plaintiff relies on the limited amount of training that Deputy Block and PERT Deputy Norman-Hendersen received in handling mentally ill individuals. No facts are presented as to the frequency with which the deputies interact with mentally ill individuals or whether there are any guidelines to guide deputies in responding to mentally ill individuals. The few facts provided render Plaintiff's argument weak. However, in light of the facts most favorable to Plaintiff and the related caselaw, the Court concludes there are triable issues of material fact whether providing a one-day PERT class, that did not even address how officers should handle incidents involving a mentally ill person, or a three-day PERT class at the police academy, reveal a deliberate indifference to a foreseeable need for additional training.

Accordingly, the Court DENIES Defendants' motion to dismiss the <u>Monell</u> cause of action.

**D.    Third Cause of Action –Battery; Fifth Cause of Action - Negligence and Seventh Cause of Action - Wrongful Death**

Defendants conclusorily argue that if the Court finds that Deputy Block did not violate the Fourth Amendment, there is no basis for liability under California law. In a single sentence response, Plaintiff argues that since she demonstrated disputed issues of material fact on the excessive force claim against Deputy Block, Defendants' motion should be denied. Having failed to provide the relevant legal standard for battery, negligence and wrongful death and failing to provide related facts demonstrating the absence of a genuine issue of material fact, the Court DENIES Defendants' motion for summary judgment the third, fifth and seventh causes of action. <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 322-23.

**E.    Fourth Cause of Action – Bane Act, Cal. Civil Code section 52.1**

Plaintiff complains that Deputy Block and the County interfered with Gary's constitutional rights to be free from excessive force, and committed violence against

Gary when Deputy Block shot him multiple times even though he posed no immediate threat to those present. (Dkt. No. 61, SAC ¶¶ 91-92.)

Defendants move for summary judgment on the Bane Act solely arguing that there was no "threat, intimidation or coercion" preceding the alleged Fourth Amendment's violation of the shooting. They argue that section 52.1 claim requires threat, coercion or intimidation beyond that inherent in the excessive force. Plaintiff argues that Deputy Block interfered with Gary's Fourth Amendment right to be free from an unreasonable seizure when Deputy Block unreasonably shot and killed Gary.

The Bane Act provides a private cause of action against anyone who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by an individual or individuals of rights secured by the Constitution or laws of the United States, or laws and rights secured by the Constitution or laws of California." Cal. Civil Code § 52.1(a). A plaintiff must allege "(1) interference with or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation, or coercion." Allen v. City of Sacramento, 234 Cal. App. 4th 41, 66-67 (2015) (case involved threatened arrests and threatened confiscation of property and also noting that the case does not involve excessive force).

"Some constitutional violations may be serious enough that the coercion inherent in those violations is enough to constitute coercion for the purposes of a Bane Act claim." Hernandez v. City of San Jose, 241 F. Supp. 3d 959, 983 (N.D. Cal. 2017) (citing Adamson v. City of San Francisco, Case No. 13cv5233-DMR, 2015 WL 5467744, at *2, *9 (N.D. Cal. Sept. 17, 2015) (involving excessive use of force when plaintiff was allegedly "slam[med] . . . to the ground.")). In Simmons v. Superior Ct., the court of appeal noted that the majority of federal district courts have held "[w]here Fourth Amendment unreasonable seizure or excessive force claims are raised and intentional conduct is at issue, there is no need for a plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or use of force." 7 Cal. App. 5th

1113, 1126 (2016) (quoting <u>Dillman v. Tuolumne County</u>, No. 1:13–CV–00404–LJO–
SKO, 2013 WL 1907379, at *21 (E.D. Cal. May 7, 2013)).  This Court has also
concluded that when intentional conduct is involved, a plaintiff does not need to provide
evidence showing threats, intimidation or coercion separate from a constitutional
violation.  <u>See</u> <u>Mann v. Cnty. of San Diego</u>, 147 F. Supp. 3d 1066, 1092 (S.D. Cal.
2015); <u>Estate of Lopez ex rel. Lopez v. City of San Diego</u>, No. 13cv2240-GPC(MDD),
2014 WL 7330874, at *15 (S.D. Cal. Dec. 18, 2014).

 Here, Plaintiff's Bane Act is based on Deputy Block's alleged excessive use of
force.  Therefore, contrary to Defendants' argument, Plaintiff does not need to allege a
threat, coercion or intimidation separate from the excessive force.  <u>See</u> <u>id.</u>  Because the
Court concludes that there are genuine issues of disputed material fact whether the force
used was excessive, it similarly concludes that there are genuine issues of disputed
material fact whether the excessive force was by "threats, intimidation or coercion."
Accordingly, the Court DENIES Defendants' motion for summary judgment on the
fourth cause of action for violation of California Civil Code section 52.1.

## F. Sixth Cause of Action - Negligent Hiring, Retention, Supervision as to Defendant Sheriff Gore

 Plaintiff claims that Sheriff Gore was negligent in hiring, retaining and supervising
the deputies as Deputy Block and other deputies were unfit and/or incompetent to
perform their duties and created a particular risk to the public by inadequately dealing
with individuals in the midst of a mental health crisis.  (Dkt. No. 61, SAC ¶¶ 104-06.)
Plaintiff also seeks to impose liability on the County under Government Code section
815.2(a).  (Dkt. No. 61, SAC ¶ 109.)

 Defendants claim that Sheriff Gore is not liable for two reasons.  First, there is no
causal connection to Deputy Block's use of force.  Second, a public employee cannot be
civilly liable for misconduct of subordinates under California Gov't Code section 820.8
which states that "a public employee is not liable for an injury caused by the act or
omission of another person."  Cal. Gov't Code § 820.0.  They also argue that California

cases bar negligent hiring and supervision claims against a public entity. In response, Plaintiff argues that Gore, as the Sheriff, may be directly liable for negligence and the County is vicariously liable pursuant to California Gov't Code section 815.2.

The California Tort Claims Act ("CTCA") provides the exclusive scope of tort liability for government entities and employees. Cal. Gov't Code § 810, *et seq*. The CTCA abolished common law governmental tort liability. Becerra v. Cnty. of Santa Cruz, 68 Cal. App. 4th 1450, 1457 (1998). Thus, "in absence of some constitutional requirement, public entities may be liable *only* if a statute declares them to be liable." Id. (emphasis in original); see also Cal. Gov't Code § 815; Michael J. v. Los Angeles Cnty. Dept. of Adoptions, 201 Cal. App. 3d 859, 866 (1988) ("Under the Act, governmental tort liability must be based on statute; all common law or judicially declared forms of tort liability, except as may be required by state or federal Constitution, were abolished").

Under the CTCA, a public employee is generally "liable for injury caused by his act or omission to the same extent as a private person." Cal. Gov't Code § 820(a). California Government Code section 815.2 "makes a public entity vicariously liable for its employee's negligent acts or omissions within the scope of employment." Eastburn v. Regional Fire Protection Auth., 31 Cal. 4th 1175, 1180 (2003). However, "liability of the employer only attaches if and when it is adjudged that the employee was negligent," and, although "public entities always act through individuals, that does not convert a claim for direct negligence into one based on vicarious liability." Sanders v. City of Fresno, No. Civ. F–05–0469 AWISMS, 2005 WL 2435893, at *9 (E.D. Cal. Sept. 30, 2005); Megargee v. Wittman, 550 F. Supp. 2d 1190, 1210 (E.D. Cal. 2008).

There is no statutory basis for direct claims against a public entity for negligent hiring and supervision practices. de Villers v. Cnty. of San Diego, 156 Cal. App. 4th 238, 252 (2007) ("We find no relevant case law approving a claim for direct liability based on a public entity's allegedly negligent hiring and supervision practices."). Thus, there can be no direct liability of negligent hiring, retention or supervision against the County.

Next, the Court considers whether the County can be vicariously liable for the acts of Sheriff Gore for negligent hiring, and supervision. The County can be vicariously liable only if Sheriff Gore is personally liable for such a claim. deVillers, 156 Cal. App. 4th at 249 ("When assessing a claim for vicarious liability against a governmental employer based on the acts or omissions of its employee, a court must examine whether the employee who acted or failed to act would have been personally liable for the injury."). In support of alleging negligence liability against Sheriff Gore, Plaintiff cites to C.A. v. William S. Hart Union High Sch. Dist., 53 Cal. 4th 861 (2012) where the California Supreme Court held that a supervisory employee may be directly liable when he breaches a duty to supervise and the public employer may be held vicariously liable under section 815.2. Id. at 877. However, a plaintiff must allege a special relationship in order to bring a negligent hiring claim. Id. ("Absent such a special relationship, there can be no individual liability to third parties for negligent hiring, retention or supervision of a fellow employee, and hence no vicarious liability."); Willis v. City of Sacramento, No. 13cv1671-MCE-EFB, 2014 WL 1027070, at *6 (E.D. Cal. Mar. 14, 2014) (dismissing negligent hiring, supervision, and retention claim against sheriff due to plaintiff's failure to allege a special relationship with sheriff). In C.A., the California Supreme Court held that school administrators could be individually liable for their negligence in the hiring, supervision, and retention of a school employee who sexually harassed and abused a student because of the "special relationship" between administrators and their students, which the court compared to that between parents and their children. 53 Cal. 4th at 869. Therefore, the failure of a school administrator to exercise ordinary care in protecting students from harm rendered the school district liable under section 815.2 where the administrator hired an applicant known to have a history of molesting students or where, after hiring an applicant, the administrator learned about the employee's sexual misconduct. Id. at 869-70, 879.

In de Villers, where the county toxicologist had poisoned her husband with poison that was taken from the county coroner's office, the court held that there could be no

individual liability or vicariously liability by the county for the failure to investigate the toxicologist before hiring her because other employees of the coroner's office had no special relationship with the husband of the homicidal toxicologist; therefore, they had no duty to protect him against his wife. deVillers, 156 Cal. App. 4th at 249.

Here, Plaintiff does not allege a special relationship existed between Gary and Sheriff Gore. Therefore, Sheriff Gore cannot be personally liable for a claim of negligent hiring and supervision and consequently, the County cannot be vicariously liable under California Government Code section 815.2. See deVillers, 156 Cal. App. 4th at 249. Accordingly, the Court GRANTS Defendants' motion for summary judgment on the sixth cause of action for negligent hiring, retention, and supervision as to Sheriff Gore and the County.

## G. Ninth Cause of Action – Unreasonable Seizure of Cynthia

Plaintiff alleges a claim of unreasonable seizure against Defendants Lieutenant Brown-Lisk, Detective Barnes, Detective Hillen, Sergeant Lopez, Deputy Norie, Deputy Collis and Deputy Worthington. (Dkt. No. 61, SAC ¶ 121.) She claims these defendants locked Cynthia in a patrol car, transported her to the Sheriff's station and held her there for almost seven hours. (Id. ¶ 121.)

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. A person is "seized" for Fourth Amendment purposes "only if, in view of all of the circumstances surrounding the incident, a reasonable person [in the subject's position] would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. In Mendenhall, the circumstances did not constitute a seizure where the incident took

place in a public place, the federal agents did not wear uniforms or display any weapons, did not summon the plaintiff but approached her and identified themselves as federal agents, requested to see her ID and ticket.  Id. at 555.  The U.S. Supreme Court has held that lawfully seized individuals do not need to be advised that they are "free to go" before a seizure is recognized as voluntary.  Ohio v. Robinette, 519 U.S. 33, 40 (1996).

The Ninth Circuit has held that the "detention of witnesses for investigative purposes can be reasonable in certain circumstances."  Maxwell v. Cnty. of San Diego, 708 F.3d 1075, 1083 (9th Cir. 2013).  To determine the reasonableness of a witness's detention, courts examine "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Id. (quoting Brown v. Texas, 443 U.S. 47, 51 (1979)).  The court concluded that the state's interest in an investigative witness' detention is "relatively low.  Id. at 1084 (citing United States v. Ward, 488 F.2d 162, 169 (9th Cir. 1973) (en banc)).   As such, the detention must be "minimally intrusive."  Id. at 1083.

In Maxwell, the decedent's parents alleged that their over-five-hour detention and separation from one another by law enforcement officers violated their Fourth Amendment right to be free from unreasonable seizure.  Id. at 1083.  They were seized solely because they were witnesses to a crime.  Id.  The parents were reunited after the investigators finished interviewing the decedent's mother.  Id. at 1081.  The Court noted that the Supreme Court "has never endorsed a detention longer than 90 minutes" even in a Terry[6] stop which involves a suspicion of criminal activity.  Id. at 1084.  In support of its conclusion, the court also noted there was no allegation that there was probable cause to arrest or reasonable suspicion to detain, the crime had been solved, the detention was

---

[6] Terry v. Ohio, 392 U.S. 1 (1968).

not incident to a search, and was not to prevent the destruction of evidence.  <u>Id.</u> at 1085-86.

Here, Cynthia states that Deputy Norie and another deputy roughly grabbed her arms and escorted her to a marked SUV and placed her in the back seat.  (Dkt. No. 75-2, Kendrick Decl. ¶ 18.)  The doors could only be unlocked from the outside and she could not roll down the windows.  (<u>Id.</u>)  She states that Deputies Norie and Collis ignored her request for fresh air and were not even present for much of the time she was in the car.  (<u>Id.</u>)  It was hot and she felt like she was suffocating and sat in there for about 20 to 30 minutes.  (<u>Id.</u> ¶¶ 18, 19.)  Around 10:08 am, Sergeant Lopez directed Deputy Collis to drive Deputy Norie and Cynthia to the station together.  (Dkt. No. 79-2, Ds' Response to P's Add'l Facts, No. 75.)  At the Encinitas station, she was placed in an interrogation room that was guarded by Deputy Collis.  (Dkt. No. 75-2, Kendrick Decl. ¶¶ 19, 20.)  Later, Lieutenant Brown-Lisk directed Deputy Worthington to relieve Deputy Collis and to be with Cynthia until homicide detectives could interview her.  (Dkt. No. 75-1, McBride Decl., Ex. J, Brown-Lisk Depo.at 37:1-6.)  Detectives Barnes and Hillen arrived around 1:30 p.m. and told her she had to stay for questioning, which lasted for hours.  (Dkt. No. 75-2, Kendrick Decl. ¶ 22.)  Once the interrogation was complete, Detectives Barnes and Hillen told her she had to remain at the station so she could be photographed by forensic technicians.  (<u>Id.</u> ¶ 24.)  Cynthia states she never consented to being held in the patrol car, to being transported to the sheriff's station, to being held and interrogated by detectives, and to being held for forensic photographing.  (<u>Id.</u> ¶ 26.)  Cynthia was detained from 10:08 am to 4:30 p.m. for questioning and photographing her.  (Dkt. No. 75-1, McBride Decl., Ex. G, Collis Depo. at 33:10-34:1; Dkt. No. 75-2, Kendrick Decl. ¶ 26.)  Her actual interrogation lasted about 2 or 2.5 hours but she was at the station for seven hours.  Plaintiff's facts present genuine issues of material fact as to whether the manner and length of her detention constitute an unreasonable seizure.  The Court DENIES Defendants' motion for summary judgment on the ninth cause of action.

15cv2615-GPC(AGS)

**H.     Tenth Cause of Action – Unreasonable Search under 42 U.S.C. § 1983**

Plaintiff complains of an unreasonable search against Detectives DuGal and Mays. (Dkt. No. 61, SAC ¶¶ 125-29.)  She alleges that the search warrant of her residence was overly broad.  (Id. ¶ 125.)  Detective DuGal instructed Detective Mays to obtain a search warrant despite the fact there was no probable cause to support it and then Mays made several statements in reckless disregard to the truth which the state court judge relied on in issuing the warrant.  (Id. ¶ 126.)  Moreover, the warrant affidavit and warrant itself are unconstitutionally vague as they lack any reference to what crime was being investigated. (Id. ¶ 127.)

In a claim for judicial deception in obtaining a search warrant, a plaintiff "must 1) make a 'substantial showing' of deliberate falsehood or reckless disregard for the truth and 2) establish that, but for the dishonesty, the challenged action would not have occurred." Liston v. Cnty. of Riverside, 120 F.3d 965, 973 (9th Cir. 1997) (citing Hervey v. Estes, 65 F.3d 784, 788-89 (9th Cir. 1995)).  ("[M]isstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." Chism v. Washington, 661 F.3d 380 (9th Cir. 2011) (quoting United States v. Smith, 588 F.2d 737, 740 (9th Cir. 1978)).

Here, the parties dispute the contents of the search warrant affidavit and search warrant, and Plaintiff's SSUF references Exhibits 4 & 5 to Deputy Mays' deposition; however, the search warrant and affidavit are not in the record.  Without knowing the contents of these two documents, neither party has met its burden in demonstrating whether summary judgment should be granted or denied.  Accordingly, the Court DENIES Defendants' motion for summary judgment on the tenth cause of action for an unreasonable search under the Fourth Amendment.

**I.     Qualified Immunity**

The ten individual defendants move for summary judgment on all of the § 1983 claims based on qualified immunity.  Defendant Deputy Block is sued under the first cause of action for excessive force, Defendants Barnes, Brown-Lisk, Collis, Hillen,

Lopez, Norie and Worthington are sued in the ninth cause of action of unreasonable seizure of Cynthia, and Deputies Dugall and Mays are sued in the tenth cause of action involving an alleged unlawful search.

Government officials who perform discretionary functions generally are entitled to qualified immunity from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986). The United States Supreme Court has presented a two-part analysis for determining qualified immunity claims, which the court may address in any order. Pearson, 555 U.S. at 236. Qualified immunity protects government officials from liability for civil damages "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct." Ashcroft v. al Kidd, 563 U.S. 731, 735 (2011).

When the facts are disputed, in analyzing qualified immunity, the Court assumes "the version of the material facts asserted by the non-moving party" and "draw all reasonable inferences in favor of the non-moving party." Mattos v. Agarano, 661 F.3d 433, 439 (9th Cir. 2011) (citations omitted); Jeffers v. Gomez, 267 F.3d 895, 903 (9th Cir. 2001) ("Where disputed facts exist, however, we can determine whether the denial of qualified immunity was appropriate by assuming that the version of the material facts asserted by the non-moving party is correct.").

Under the first prong, "the court determines whether the facts alleged, construed in the light most favorable to the injured party, establish the violation of a constitutional right." Dunn v. Castro, 621 F.3d 1196, 1200 (9th Cir. 2010) (citing Saucier v. Katz, 533

U.S. 194, 201 (2001). As to the second prong, "the court decides whether the right is clearly established such that a reasonable government official would have known that 'his conduct was unlawful in the situation he confronted.'" Id. at 1199 (quoting Saucier, 533 U.S. at 202).

### 1. Whether the Facts Alleged Show Deputy Block's Conduct Violated a Constitutional Right

This position is based upon the facts relied upon by the defense. As discussed above, the Court concluded there are disputed issues of material fact whether Deputy Block violated Gary's constitutional right to be free from excessive force as well as whether there was an unlawful seizure of Cynthia.

However, taking Plaintiff's facts as true and construing them in the light most favorable to Gary, Deputy Block acted unreasonably and violated Gary's constitutional right to be free from excessive force. Similarly, as to Cynthia's unlawful seizure claim, the Deputies acted unreasonably and violated her constitutional right to be free from an unreasonable seizure. Accordingly, the Court turns to the second prong of the qualified immunity analysis.

### 2. Whether the Right was Clearly Established

Public officials are immune from a section 1983 suit unless they have "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." City and Cnty. of San Francisco, 135 S. Ct. 1765, 1774 (2015). Under the second prong, the Court must consider whether the alleged Fourth Amendment violations of excessive force and unreasonable seizure "w[ere] clearly established at the time of the officer's alleged misconduct." S.B. v. Cnty. of San Diego, 864 F.3d 1010, 1015 (9th Cir. 2017). "[T]he court decides whether the right is clearly established such that a reasonable government official would have known that 'his conduct was unlawful in the situation he confronted.'" Dunn, 621 F.3d at 1199 (quoting Saucier, 533 U.S. at 202).

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle v.

15cv2615-GPC(AGS)

Howards, 566 U.S. 658, 664 (2012) (internal marks omitted).  The United States Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  Mullenix v. Luna, 136 S. Ct. 305, 308 (2010) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).  Recently, the Supreme Court reiterated that "'clearly established law' should not be defined "at a high level of generality."  White v. Pauly, 137 S. Ct. 548, 552 (2017) (quoting Ashcroft, 563 U.S. at 742).  Instead, "the clearly established law must be 'particularized' to the facts of the case."  Id. (concluding that appellate court failed to point to a case where an officer acting under similar circumstances as the officer in question was held to have violated the Fourth Amendment).  However, in an "obvious case", clearly established can be met "without a body of relevant case law."  Maxwell v. Cnty. of San Diego, 708 F.3d 1075, 1083 (9th Cir. 2013) (quoting Brousseau v. Haugen, 543 U.S. 194, 199 (2004)).

On the second prong, the Court looks at whether the right was clearly established prior to March 27, 2015, the date of the incident, such that a reasonable officer would have known that shooting Gary was unlawful.

Defendants argue that, under Fourteenth Amendment precedent, no-clearly established authority holds that it is unreasonable for a uniformed peace officer to shoot a person who is known to have recently threatened to shoot someone, who is armed with a shotgun, and who swings his shotgun in the direction of the officer and takes a shooter stance, while disregarding officer commands to drop the gun.  (Dkt. No. 70-1 at 28.)  However, this argument relies upon defendants' view of the evidence and fails to analyze this issue based upon the facts most favorable to the Plaintiff.

Plaintiff argues that Deputy Block's shooting of Gary was obviously unlawful.  And even if not an obvious case, Plaintiff asserts that Glenn v. Washington Cnty., 673 F.3d 864 (9th Cir. 2011), and Deorle v. Rutherford, 272 F.3d 1272 (9th Cir. 2001) provided Deputy Block with notice that his shooting of Gary was unlawful.  The Court concludes that Ninth Circuit law, including George v. Morris, 736 F.3d 829, 838 (9th Cir. 2013), provided clearly established law prior to Gary's shooting that shooting an

individual holding a shotgun with his arms outstretched constitutes a Fourth Amendment violation.

An individual armed with a deadly weapon does not render the officers' use of force per se reasonable under the Fourth Amendment.  See Glenn, 673 F.3d at 872–73; see also Harris v. Roderick, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.").  However, "[i]f the person is armed—or reasonably suspected of being armed-a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." George v. Morris, 736 F.3d 829, 838 (9th Cir. 2013).  In George, the Ninth Circuit concluded that "[i]f the deputies indeed shot the sixty-four-year-old decedent without objective provocation while he used his walker, with his gun trained on the ground, then a reasonable jury could determine that they violated the Fourth Amendment." George, 736 F.3d at 839.

In Glenn, officers fatally shot a suicidal and intoxicated 18 year old Lukas Glenn in his driveway when he did not comply with orders to put down a pocketknife. Glenn, 673 F.3d at 867–69.  His mother called 911 after Lukas began damaging household property and threatened to kill himself with a pocketknife. Id. at 866.  Initially, the officers shot Lukas with a bean bag gun. Id. at 869.  Afterwards, when Lukas took a couple of steps towards his house, officers shot him eight times with their semi-automatic weapons which caused his death. Id.  The Ninth Circuit held that in viewing the evidence in the light most favorable to the plaintiff, a jury could conclude that the officers' conduct violated the Fourth Amendment and were not justified in shooting Lukas, who was holding the pocket knife to his neck and did not brandish it at anyone with the bean bag gun. Id. at 868, 873.  There was little evidence that Lukas posed an "immediate threat" to anybody. Id. at 874.  Although not involving facts particular to this case since Lukas was holding a pocketknife, and not a shotgun, Glenn provided Deputy Block with notice that shooting at an individual that did not pose an "immediate threat" while wielding a pocketknife at his neck was a violation of the Fourth Amendment.

Meanwhile, in <u>Deorle</u>, officers were called by Deorle's wife who was concerned about her husband who was drunk, acting out of control and became suicidal. <u>Deorle</u>, 272 F.3d at 1276–77. Deorle initially "brandish[ed] a hatchet" and a crossbow and was verbally abusive to officers, threatening to "kick [their] ass" but complied with orders to drop the hatchet and the crossbow. <u>Id.</u> at 1276-77. Later, Deorle began walking at a "steady gait" in an officer's direction while he was unarmed, the officer did not warn Deorle that he would be shot if he physically crossed an undisclosed line or order him to halt. <u>Id.</u> at 1281. The officer shot Deorle with a lead-filled beanbag round when he arrived at a spot the officer had predetermined. <u>Id.</u> at 1275. The shots removed Deorle's eye and lead shot was embedded in his skull. <u>Id.</u> The Ninth Circuit held that the shooting violated Fourth Amendment right to be free from excessive force. <u>Id.</u> at 1284. The Court finds <u>Deorle</u> is distinguishable from the instant case as <u>Deorle</u> involved an unarmed individual as opposed to an armed individual.

However, <u>George v. Morris</u> is a case which provided a reasonable law enforcement officer with notice that Deputy Block's actions were constitutionally infirm. 736 F.3d at 829. In <u>George</u>, the victim's wife in the early morning hours saw her husband take their truck's keys and retrieve a pistol from the truck. <u>Id.</u> at 832. She called 911 exclaiming that her husband had a gun. <u>Id.</u> Deputies arrived at the front door and the wife asked them to be quiet and not to scare her husband and informed them that he was on the back patio with his gun. <u>Id.</u> After setting up a perimeter, the deputies saw the husband open the door to the second-floor balcony. <u>Id.</u> The deputies identified themselves and directed the husband to show his hands. <u>Id.</u> He was holding a gun in his left hand with the barrel pointed down while holding a walker. <u>Id.</u> While the deputies testified that the husband turned east and raised the gun and pointed it directly at the officer causing him to fire, <u>id.</u> at 833 n.4, there was evidence to support the plaintiff's facts that her husband did not turn the gun towards the officers. <u>Id.</u> The Ninth Circuit stated that "[w]hen an individual points his gun 'in the officers' direction,' the Constitution undoubtedly entitles the officer to respond with deadly force. <u>Id.</u> at 838 (citing <u>Long v. City & Cnty. of Honolulu</u>, 511

F.3d 901, 906 (9th Cir. 2007)). However, the court continued that given the plaintiff's version of events, a reasonable trier of fact could conclude that the deputies' use of force was excessive. Id. at 836, 838. George stands for the obvious proposition that an officer is not entitled to use deadly force against an individual who is armed unless the individual makes "a furtive movement, harrowing gesture, or serious verbal threat that might create an immediate threat." Id. at 838.

Here, the facts most favorable to Plaintiff reveal that Gary was facing Deputy Block, standing in a cross pose, with his arms outstretched and near parallel with the ground holding a bottle of vodka in his right hand and the barrel of the shotgun in his left hand. Gary did not swing or aim the shotgun towards Block, never had his hand near the trigger of the shotgun, and did not lower his arms from a parallel position before Deputy Block began shooting. Accepting these facts as true, Gary did not make a furtive movement or harrowing gesture, and did not otherwise engage in conduct that might create an immediate threat. Under George, it was clearly established that shooting Gary with his arms outstretched and parallel to the ground with a shotgun in one hand and a liquor bottle in the other hand, without any further movements or gestures, was a violation of Gary's Fourth Amendment rights to be free from excessive force.

Next, Defendants Barnes, Brown-Lisk, Collis, Hillen, Lopez, Norie and Worthington are sued in the ninth cause of action for the unreasonable seizure of Cynthia. On this claim, the Court looks at whether it was clearly established prior to March 27, 2015, the date of the incident, that Defendants Barnes, Brown-Lisk, Collis, Hillen, Lopez, Norie and Worthington had notice that their conduct was unlawful.

As discussed above, in Maxwell, the Ninth Circuit held in 2013 that it was clearly established and the officers were on notice that "they could not detain, separate, and interrogate the [plaintiffs] for hours" especially in a case where there was no probable cause or reasonable suspicion of crime, it was not a detention incident to a search and not to prevent the destruction of evidence. Id. at 1084-85. Similarly, in this case, Cynthia, a witness to the shooting death of her husband, was detained, locked in a patrol vehicle

30

without the ability to leave, transported to the Sheriff's station, interrogated for over two hours, and remained at the station for seven hours. The shooting of Gary had already occurred and there was no crime to solve, the detention was not incident to a search and there was no threat of destruction of evidence. Taking Cynthia's fact as true, the Court concludes that Defendants Barnes, Brown-Lisk, Collis, Hillen, Lopez, Norie and Worthington were on notice that they could not "detain, separate, and interrogate" Cynthia for hours. See Maxwell, 708 F.3d at 1084-85.

Next, as to the unlawful search claim against Deputies May and DuGal, as discussed above, the Court is without sufficient evidence to make a determination and declines to determine whether it was clearly established that they violated Cynthia's right to be free from an unreasonable search.

## J. Evidentiary Objections

In their reply, Defendants filed objections to Cynthia Kendrick's declaration as they are contradictory to the account she gave in her audio-recorded interview. They contend that during her interview, she stated that Gary held the shotgun in his right hand and a vodka bottle in his left hand and that he threw the shotgun down before he was shot but then stated she was not certain and may have thrown down the vodka bottle. However, her declaration states that the shotgun was in Gary's left hand and the bottle was in his right hand. They note that even her declaration contains an inconsistent statement as to which hand Gary was holding the shotgun.

A court may disregard facts in a declaration filed in a motion for summary judgment if they are "blatantly contradicted" by the record, "so that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007) (plaintiff's facts were clearly contracted by the videotape of the incident); Brown v. Cnty. of San Bernardino, 250 F. Supp. 3d 568, 587 (C.D. Cal. 2017) (disregarding Plaintiff's evidence as it was "blatantly contradicted" by the audio recordings).

Here, statements made by Cynthia during the interview do not blatantly contradict the facts in her declaration. In fact, her declaration, itself, contains an inherent

discrepancy. In one paragraph, she states the shot gun was in Gary's left hand and liquor bottle was in the right hand, (Dkt. No. 75-2, Kendrick Decl. ¶ 13), and in another paragraph, she states the reverse. (Id. ¶ 8.) Paragraph 8 of her declaration is consistent with her interview statement. The audio-recording of the interview reveals a very distraught and hysterical Cynthia and she may have been confused as to which hand Gary was holding the shotgun. During the interview, he stated that the shotgun was in his right hand and the vodka bottle was in his left hand. (Dkt. No. 70-7, Ds' NOL, Ex. D, Audio Recording Tr. at 37:16-22.) Cynthia's interview statements are not necessarily blatantly contracted by the audio-recording. A resolution of this disputed fact is one for the trier of fact.

Defendants, in their reply, for the first time object to the expert reports of David E. Balash, Alan A Abrams, and Scott A DeFoe offered in support of Plaintiff's opposition and conduct a <u>Daubert</u>[7] analysis. Typically, the Court will not consider an argument raised for the first time in the reply. <u>Zamani v. Carnes</u>, 491 F.3d 990, 997 (9th Cir. 2007) (noting that district courts need not consider arguments raised for the first time in a reply brief).

However, in ruling there are disputed issues of material facts, the Court did not consider Plaintiff's expert reports and were not necessary for the Court's ruling. Accordingly, the Court OVERRULES Defendants' evidentiary objections.

## Conclusion

Based on the above, the Court GRANTS in part and DENIES in part Defendants' motion for summary judgment. Specifically, the Court GRANTS Defendants' motion for summary judgment the eighth cause of action as unopposed, GRANTS Defendants' motion on the first cause of action for excessive force as to the County, GRANTS Defendants' motion for summary judgment on the sixth cause of action for negligent

---

[7] <u>Daubert v. Merrell Dow Pharms. Inc.</u>, 509 U.S. 579 (1993).

hiring, retention, and supervision, and DENIES Defendants' motion on all remaining causes of action.   The Court **VACATES** the hearing set on March 16, 2018.

   IT IS SO ORDERED.

Dated:  March 14, 2018

Hon. Gonzalo P. Curiel
United States District Judge